NUMBER 13-01-00402-CR

 

                             COURT OF APPEALS

 

                   THIRTEENTH DISTRICT OF TEXAS

 

                                CORPUS CHRISTI

 



 

DAVID CORONA GUAJARDO,                                                Appellant,

 

                                                   v.

 

STATE
OF TEXAS,                                                                 Appellee.

 



 

                        On appeal from the 138th District Court

                                 of Cameron
County, Texas.

 



 

                                   O P I N I O N

 

          Before Chief Justice Valdez and Justices Yañez
and Castillo

                                  Opinion by Justice Castillo                  

 








By indictment, the
State of Texas charged appellant David Corona Guajardo with intentionally and
knowingly causing serious bodily injury to a child.[1]  A jury convicted appellant of the lesser
offense of recklessly causing serious bodily injury to a child and sentenced
him to ten years incarceration.[2]  From this conviction, Guajardo appeals two
issues:  (1) a fatal variance between the
allegations in the indictment and the proof at trial; and (2) the sufficiency
of the evidence to support his conviction. 
We overrule the first issue, hold that appellant waived the second, and
affirm.  

                                            PROCEDURAL
HISTORY

The State indicted
appellant as follows:

David Corona Guajardo,
hereinafter called the Defendant, on or about the 14th day of October, 2000,
and anterior to the presentment of this indictment, in the County of Cameron
and State of Texas, did then and there intentionally or knowingly, cause
serious bodily injury to David Guajardo, Jr., a child younger than 15 years of
age, by striking the head of David Guajardo, Jr. with an object unknown to the
Grand Jury or by causing the head of David Guajardo, Jr. to strike an object
unknown to the Grand Jury or by shaking or squezzing [sic] the neck of David
Guajardo, Jr. with his hands.  

 








Appellant pled not
guilty, and the case was tried to a jury. 
After the conclusion of the State=s case-in-chief,
appellant moved for an instructed verdict, asserting a fatal variance between
the indictment and the proof at trial in that the State did not present
evidence regarding the grand jury=s diligence in finding
out what caused the injury to the child. 
The trial court denied the motion. 
Appellant later testified in his own defense that he accidentally
injured the child.  After both sides
rested and closed, appellant re-urged his motion for instructed verdict.  The trial judge again denied the motion and
submitted the court=s charge containing
application paragraphs for each of the three possible culpable mental states
for the offense of serious bodily injury to a child:  (1) intentional and knowing; (2) reckless;
and (3) criminally negligent.  Appellant
did not object to submission of the lesser offenses.[3]  The application paragraphs for each tracked
the language of the indictment.   

The jury found
appellant guilty of recklessly causing serious bodily injury to a child, and
this appeal ensued.  

THE RELEVANT EVIDENCE
AT TRIAL

The injured child=s mother testified
that appellant is the child=s father.  At 7:00 a.m. on October 14, 2000,
appellant came home from his fourth straight day of twelve-hour shifts on his
job as a correctional officer.  The child=s mother left for work
a short while later, leaving the child (at the time six months old) and the
baby=s two half-siblings
(ages six and seven) in appellant=s care.  The mother testified that the baby had no
visible injuries and was in good condition when she left for work that
morning.  

One of the baby=s half-siblings
testified that the two older children played in another room after their mother
left for work while appellant and the baby went to bed.  Several hours later, the half-sibling heard
loud banging noises coming from the bedroom in which appellant was sleeping
with the baby.  He also testified that
appellant told him not to tell his friends about the loud bangs.  








The baby=s mother testified
that appellant called her early the afternoon of October 14, 2001 and told her
that the baby was in the emergency room at the hospital.  She said he told her that he had put the baby
on the bed next to him and that they had both fallen asleep.  He told her that he had been awakened by the
baby=s cries in the early
afternoon, only to discover that the child had fallen off the bed onto the
carpeted floor.  

The baby=s medical records,
introduced at trial, reveal the following interview and treatment notes:

Father states he was
sleeping with the infant on the bed and heard the baby cry and found the baby
on the floor, bruising to the right side of the face, swelling, shallow and
slow respirations.  . . .  Diagnostic impression:  1. 
Acute closed head injury with non-depressed right parietal skull
fracture. . . .

 

                                                          *
* *

 

6 month old child
brought in by parents unresponsive and Aalmost@ intubated on
arrival.  Told that father found him on
floor of bed.  Child sleeps on bed [with]
parents.  Dad awoke to sound of
crying.  Child was on floor
([approximately] 3' bed).  Floor is
carpeted (thin carpet). . . .

 

                                                          *
* *

 

obvious injury greater
than expected from fall onto floor (carpet) from 3' bed. . . .

 

                                                          *
* *

 

Principal Diagnosis:
Closed fracture, skull vault with subarachnoid/subdural/extradural hemorrhage,
unconsciousness, unspecified duration; Secondary Diagnoses: . . . shaken infant
syndrome. . . .  child and
adult battering and maltreatment by father or stepfather. . . .

 

                                                          *
* *

 








Shaken Impact Syndrome
- Non Accidental Closed Head Trauma

 

                                                          *
* *

 

This child has a very
significant skull fracture and retinal hemorrhages.  There is no question this is child
abuse.  This did not occur by falling off
the bed, and his injuries are all quite acute and I have no doubt occurred this
morning after the mother had left the child alone.  

 

                                                          *
* *

 

The nature &
extent of this baby=s injuries is not
possible from [history] provided

 

                                                          *
* *

 

Diagnosis: . . .
suspected child abuse . . .  Condition:
critical . . . .

 

                                                          *
* *

 

Father stated to me
that Ahe might have hit the
baby during his sleep but could not remember.@ . . .

 

                                                          *
* *

 

[The child=s mother] stated when
she arrived at the hospital, the father told her that he had fallen asleep on
the bed with the Pt at approximately 9:00 AM. 
She stated the father told her that he heard the Pt crying, however, he
was too sleepy to realize that they [sic] baby was crying.  She stated he told her he work [sic] up
around 12:30 PM or 1:00 PM, and found the Pt on the floor
unconscious.  She stated he told her he
tried to move the Pt=s hands, and they were
limp.  She stated the father stated he
started Alight CPR,@ and heard Awheezing sounds@ from the Pt.  She stated the father then Apanicked@ and Atook off to the
hospital@ with the Pt.  She stated the father left the 2 siblings
alone in the home when he left with the Pt. 
. . .  Assessment: The injuries
the Pt has received are not consistent with the explanation of the injury give
by the parents.  I feel that the Pt is a
victim of child abuse.  . . .

 








The authorities took
appellant into custody on October 17, 2001. 
On October 18, 2001, in a voluntary statement that the State also
introduced into evidence, appellant gave the following account of the way in
which the baby was injured:

I don=t know for sure what
time it was when I woke up.  I don=t know who woke up
first.  David or me.  David was crying.  He wanted his bottle.  I started playing with him to make him quit
crying.  I was going to go get the
bottle.  I got up and picked him up.  I started tossing him in the air.  I was between the bed and the dresser towards
the hallway going out of the bedroom.  I
tossed him into the air a number of times. 
David was smiling.  I was tossing
him way up in the air.  The last time I
missed his hands, or he slipped through my hands and he hit the dresser, and
went to the floor.  After that I went
down and grabbed him about the same time he was hitting the floor.  I don=t know, his eyes did
something.  Maybe he had a seizure or was
unconscious.  I got scared and I
panicked.  I knew something
happened.  I felt for a pulse and found
none.  I gave him CPR the first time on
the bed.  I got something like a
response.  His stomach would start doing
something.  I then grabbed him up and was
holding him talking to him.  I took him
to the red sofa.  I don=t know if I shook him
before I gave him CPR on the red sofa or not. 
I did shake him.  I remember I
shook him to see if he would wake up.  I
was trying to wake him up, I was not trying to hurt him.  I had given him CPR twice and when nothing
happened I just took off to the hospital. 
I almost got in a wreck on the way out. 
My car turned off.  When I stopped
David slid forward on the seat.  I caught
him, and I gave him CPR again.  I got the
car going and I sped to the hospital.  I
didn=t want to wait minutes
for the ambulance.  I could get there
quicker.  . . .

 

The baby=s mother testified
appellant told her after his arrest that Ahe was like throwing
[the baby] up in the air and he had fallen and hidden [sic] himself on a shelf
that was in the room.@  

Investigating officers
testified that appellant initially told them that the baby had fallen off the
bed.  The State introduced photographs
one of the officers took of the bedroom where the child was injured.  The photographs showed several pieces of
furniture in the room as well as a baseball bat leaning against one wall.  








One of the baby=s treating physicians
testified as an expert witness during the State=s case-in-chief. 
He testified that the child had sustained a life-threatening injury and
that his injuries included a Avery significant@ skull fracture,
bruising of his head and face, bleeding in the back of his eyes, and paralysis
on the right side of his body.  The
doctor stated that the symptoms the child exhibited in the emergency room would
have become noticeable Aimmediately@ after the injury
occurred and that there was no way the child sustained the injuries the night
before.  The doctor compared the baby=s injuries to those
inflicted by Abeing ejected from a
high speed automobile accident,@ and concluded that
the injuries could have been caused by A[a] blow to the head
with a fist, a baseball bat.@  The prosecutor asked the doctor if he could
tell from examining the baby what had caused his injuries:

Q.               
Can you tell from looking at the baby if the baby was
struck against something, or something struck the baby?

 

A.        I can=t tell.

 

Q.        You know
that something impacted that baby, or the baby impacted something?

 

A.        Yes.

 








The
doctor further testified that the baby suffered permanent brain damage and Asevere@
impairment, is developmentally delayed, and will never fully recover.  AMost
adults with this degree of damage,@
the doctor concluded, Awould
not live.  This baby very easily could
have died.@  On cross-examination, he stated his opinion unequivocally,
ALet me go on record.  This child was beaten to a pulp, and is a
victim of child abuse.  I won=t beat around the bush any more.@ 


After
the State rested, appellant testified to the following version of events the
afternoon of October 14, 2000:

Q.        Okay.  And being, when you heard the baby cry, did
that somewhat bother you?

 

A.        It woke
me up, but it didn=t bother
me.

 

Q.        Okay.  And what did you do when the baby woke up and
was crying?  What did you do?

 

A.        I got
up.

 

Q.        Okay?

 

A.        And I B I grabbed him.

 

Q.        Okay.

 

A.        (Indicating)

 

Q.        And was
he on the bed at that time?

 

A.        Yes,
sir.

 

Q.        Okay.  And when you picked him up, what did you
do?  Where did you go?

 

A.        I
started playing with him, and talking with him B
making baby noises.

 

Q.        Okay.  And what were you trying to do at that
time?  Why were you playing with him?

 

A.        Because
I love him B he=s my son.  I was trying to give him attention.  

 

Q.        Okay.  What happened next?

 

A.        I got
up, I started playing with him, and then? 
Well, I picked him up; I lifted him up.








Q.        And
then?

 

A.        I tossed
him in the air.

 

Q.        Now, can
you tell the jury when you say Atossed
him up,@ what
were you doing?  Show them.  They need to know.  (Indicating)

 

A.        I had
him, you know, like this (indicating) in the air.  And, then, I was playing with him and B you know B
doing baby noises and stuff, and he was laughing at me, and he was happy
(Speaks in Spanish) I found it easy, you know, just to throw him up B just playing with him.  And the second time, you know, (Speaks in
Spanish) he fell.  

 

Q.        And
where were you when you were doing this?

 

A.        In the
room.

 

Q.        Were you
close to something?

 

A.        To the
shelf B I mean B the dresser.

 

Q.        And what
happen [sic] when he fell through your arms B
when you missed him?

 

A.        He hit
the dresser.

 

Q.        With
what?

 

A.        What do
you mean, with what?

 

Q.        What hit
the dresser, Mr. Guajardo?

 

A.        I didn=t see it; his head.

 

Q.        You didn=t see what hit?

 

A.        His head
hit the dresser.

 

Q.        And what
happened next?  What did you do as a
result of that?

 

A.        Well, I
got scared.

 








Q.        Okay.  Did the baby actually fall to the floor B to the ground?

 

A.        Yes, he
did.

 

Q.        And,
what was the baby doing at that time?

 

A.        (Speaks
in Spanish) Nothing, sir.  He was just
laying there.

 

Q.        What do
you mean, just laying there?

 

A.        Lifeless.

 

We
address first appellant=s
challenge to the sufficiency of this evidence to support his conviction.  

                                                       THE
SUFFICIENCY ISSUE

Appellant did not
object to inclusion of the lesser offenses in the jury charge. A defendant who
does not object to submission of a lesser offense to the jury accepts the
benefit of that instruction and is estopped from complaining on appeal that the
evidence is legally insufficient to establish all the elements of the lesser
offense.  State v. Lee, 818 S.W.2d
778, 781 (Tex. Crim. App. 1991) (plurality op.), disapproved on other
grounds, Moore v. State, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998); Tamez
v. State, 865 S.W.2d 518, 519-20 (Tex. App.BCorpus Christi 1992, pet. ref=d); see State v.
Yount, 853 S.W.2d 6, 9 (Tex. 
Crim.  App.  1993) (op. on reh=g) (citing Lee
in holding that a defendant who accepted the benefit of a jury submission on a
lesser charge was estopped from attacking his conviction of that lesser charge
on statute of limitations grounds).[4]








Appellant argues Aalternatively@ that the evidence is
factually insufficient to support his conviction.  Appellant=s failure to object to the lesser charge
similarly estops him from asserting factual insufficiency.  Otting v. State, 8 S.W.3d 681, 686
(Tex. App.BAustin 1999, pet. ref=d, untimely filed); Bisco
v. State, 964 S.W.2d 29, 30 (Tex. App.BTyler 1997, pet.
ref'd).  Therefore, we hold that
appellant, by not objecting to submission of the lesser charge to the jury,
waived his second issue challenging the legal and factual insufficiency of the
evidence to support his conviction for recklessly causing serious bodily injury
to a child.[5]  

                                              THE
VARIANCE ISSUE

In his first issue,
appellant contends that the State failed in its proof because it was required
to offer evidence that the grand jury did not know the manner or means
appellant used to injure the child and did not do so.  Thus, appellant argues, the State did not
prove that the grand jury diligently tried to determine the manner or means before
concluding that the object used to inflict the child=s injuries was
unknown.  








The indictment alleged
that appellant caused serious bodily injury to his son by striking the baby=s head with an object unknown
to the grand jury, by causing the baby=s head to strike an
object unknown to the grand jury, or by shaking or squeezing the baby=s neck with his
hands.  If a charging instrument alleges
that the manner or means used to inflict an injury is unknown, and the evidence
at trial does not show a specific manner or means, the State makes a prima
facie showing that the manner and means were unknown to the grand jury.  Matson v. State, 819 S.W.2d 839, 847
(Tex. Crim. App. 1991); Garcia v. State, 880 S.W.2d 189, 190 (Tex. App.BTexarkana 1994, pet.
ref=d).  Only if evidence at trial shows the manner or
means must the State prove that the grand jury did not know them and diligently
tried to ascertain what they were.  Matson,
819 S.W.2d at 847. 








At trial, appellant
first moved for an instructed verdict at the close of the State=s case-in-chief on the
ground that the State had not proved the exercise of due diligence by the grand
jury in determining the manner or means used by appellant in injuring the
baby.  After the close of all the evidence,
appellant again moved for an instructed verdict on the same ground, urging that
the State had proved, through introduction of appellant=s confession that he
had dropped the baby on the dresser, how the injuries occurred.  In his brief, appellant argues that the
evidence at trial Aindicated that the
injuries suffered by the child were caused by use of a baseball bat.@  At trial, the jury heard a number of possible
explanations of how the child=s injuries occurred,
both in the form of expert medical testimony and in several different versions
of events recounted by appellant to medical personnel and investigating
authorities, each of which was inconsistent with the others and each of which
the medical evidence showed to be inconsistent with the child=s injuries.  As a consequence, the State presented no
definitive proof of exactly what manner or means appellant used to injure the
baby.  The State was not required,
therefore, to prove that the grand jury did not know the manner or means of
injury or that it had used diligence to discover them.  Id. 
We overrule appellant=s first issue.[6]

                                                    CONCLUSION

Having rejected both
of appellant=s issues, we affirm
the judgment of the trial court.  

 

ERRLINDA CASTILLO

Justice

 

Do not publish.

Tex. R. App. P. 47.3(b).

 

Opinion delivered and filed

this 24th day of October, 2002.

 

 

 

 











[1] Tex. Pen. Code Ann. '
22.04(a)(1) (Vernon Supp. 2002).





[2]
Id.  





[3]  Reckless injury to a child and criminally
negligent injury to a child are both lesser offenses in section 22.04 of the
penal code.  Tex. Pen. Code Ann. ''
22.04(e), (g) (Vernon Supp. 2002).





[4]
The defendants in Yount and Lee also submitted their own proposed
lesser charge in addition to not objecting to submission of the lesser charge
to the jury. State v. Yount, 853 S.W.2d 6, 9
(Tex.  Crim.  App. 
1993) (op. on reh=g); State
v. Lee, 818 S.W.2d 778, 781 (Tex. Crim. App. 1991) (plurality op.),
disapproved on other grounds, Moore v. State, 969 S.W.2d 4, 10 (Tex. Crim.
App. 1998).  We do not find that
distinction dispositive.   





[5]
Moreover, even if appellant=s
failure to object to the lesser charge did not bar him from challenging the
sufficiency of the evidence to support his conviction, appellant=s
second issue is without merit.  We have
closely examined the facts presented to the jury.  Applying to those facts the legal sufficiency
standard of review under Jackson v. Virginia, 443 U.S. 307, 319 (1979)
and the factual sufficiency standard under Johnson v. State, 23 S.W.3d
1,11 (Tex. Crim. App. 2000), we find the evidence contained in the record
excerpts quoted above legally and factually sufficient to support appellant=s
conviction for recklessly causing serious bodily injury to a child.  





[6]
Our conclusion is the same even if we read appellant=s
first issue as fairly raising a claim of material variance between the
indictment and the proof at trial.  In a
variance situation, the State has proved the defendant guilty of a crime but
has proved its commission in a manner that varies from the allegations in the
indictment.  Thus, a variance analysis
first requires an examination of whether there was a variance.  Gollihar v. State,  46 S.W.3d 243, 246 (Tex. Crim. App.
2001).  Then, if there was a variance, we
are required to examine its materiality. 
Id. at 257-58.  Appellant
argues on appeal that the evidence proved use of a baseball bat to injure the
child, but he argued to the trial court that his confession proved use of the
dresser in the bedroom.  Appellant=s
inconsistent arguments at trial and on appeal underscore our conclusion that
there was no variance in this case; the State did not prove exactly how
appellant injured his child, only that he did so.  Accordingly, we do not reach the question of
materiality.